## JOHNSON ET AL. v. GLASCOCK ET AL.

1. If a chancellor refuses to proceed according to the mandate of the Supreme Court in a cause in which his decree has been reversed, and the proper decree rendered by the Supreme Court; the proper mode to arrive at the justice of the case, is to require him to proceed by writ of mandamus.

2. A per-emptory writ will not however be issued in the first instance on petition; but only a rule on the Chancellor to shew cause why the writ should not issue.

3. When the direction contained in a mandate of this Court, is precise and unambiguous, it is the duty of the subordinate Court to carry it into execution. And it ought not to decline obedience upon a supposition, that the Court has inadvertently or otherwise committed an error.

MOTION for a rule against the Honorable Alexander Bowie, Chancellor of the Northern Division of the State of Alabama,

to shew cause why a writ of *mandamus* should not issue from this Court, requiring him to proceed according to the decree rendered in this cause at the last term of this Court.

The petition sets out that the complainants moved the Court of Chancery to proceed to take an account and make distribution of the estate of John Johnston, deceased, in conformity with the decree rendered and produced the certificate from the clerk of this Court, directed to the Register of the Court of Chancery, certifying the reversal &c.                    (*Supra page.*

The Chancellor declined, and made an interlocutory order, which is as follows:

In this cause a motion was submitted, based upon the decision of the Supreme Court, to refer the case to the Master, to ascertain and report, with a view to distribution, the amount &c. of the personal, and the rents and profits of the real, estate. With unfeigned reluctance, I feel constrained to refuse the motion, My respect for the Supreme Court is too profound and sincere, to permit me, captiously, to refuse obedience to any order they may send me. But when they require me to do, what I honestly believe I have no right to do, according to the established principles of the Court over which I preside, I am sure that Court will properly appreciate the motives, which has induced me to decline to do what they have required of me. On an inspection of the prayer of the complainant's bill, it will be seen that it simply asks, that the nuncupative will be set aside, and that the estate real and personal, should be decreed to descend to his heirs and distributees at law. I cannot regard this as a prayer for distribution or account; and as there is no prayer for general relief, it appears to me that the Supreme Court has already done all that the complainants have asked or designed to ask, when the bill was filed. I am confirmed in this opinion, by the fact that the Orphans' Court is established for, and invested with all the powers necessary to collect and distribute estates. While, I presume, it cannot be doubted that this Court has authority, under proper circumstances, to compel distribution of estates; I think it would be very bad policy to permit it to supersede altogether the established Courts of probate. In the case at bar, the pretended will has been set aside, and the estate of the deceased decreed to descend to his heirs at law

and distributees. Here the bill stops; and here, it appears to me, the jurisdiction of this Court, for the present ought to stop It is indispensably necessary for the protection of creditors, that administration of estates should be committed to somebody who will be responsible to them. But if this Court undertakes, on the technical notice of a trust, to seize on an estate, when there has been no administration, and to distribute it in a short hand manner, I may be permitted to ask to whom are creditors to look for payment of their demand? Who could they sue? Or shall we say they shall not sue at all? With these views, I do not feel at liberty to order the reference to the Master. The motion to refer, which I refuse to grant is annexed to this opinion. As I before said, I have reluctantly refused this motion. If the Supreme Court, on consideration of the matter, shall think me in error, I shall most cheerfully carry out' any order in this cause, they may think proper to make. But, as I presumed, that the order heretofore rendered by that Court, might have been inadvertently made, I felt that it would be the safer course, to refer it once more to them.

The motion appended, seems to have been shown in the form a decretal order, and if allowed would have directed a reference to the Master to state an account. 1. Of what real estate the said John Johnston died, seized, or possessed ; and if in possession of Glasscock or Wife, by themselves or tenants, then to report the yearly value. 2. To report the number, ages, &c. of the slaves of the deceased, and their yearly value, as well as their respective values. 3. To report what other personal estate or effects of the deceased, have come to the possession of the defendants, including choses in action, money, &c. And that the Master be authorised to examine the defendants on interrogatories, if required by the complainants, and to take the testimony of witnesses, &c., &c.

PECK, for the motion, insisted that the proper remedy in a case like this, is by mandamus, and cited, Ex parte Crane, et al., 8 Peters 193 ; Ethridge v. Hall, 7 Porter 47 ; Ex parte Sibbald, 12 Peters 473.

If, as suppposed by the Chancellor, the decree rendered in this Court was inadvertently made, it is too late for correction. (Ex parte Sibbald, 12 Peters 492,)

GOLDTHWAITE, J.—1. There can be no question, we presume, that every Superior tribunal must necesssarily possess some means to require obedience to its legitimate mandates, from all subordinate and inferior jurisdictions. Without such means, the relation of superior and subordinate never could be sustained.

The authorities cited on behalf of the motion are conclusive, that in such a case as the petition discloses the writ of *mandamus* must be allowed, if the refusal is persisted in.

2. It is not usual, however, to issue the writ in the first instance on Ex parte statements; the person supposed to be in default, is generally required to show cause why the writ of *mandamus* should not issue ; and it is only when no sufficient cause is shown, that the writ follows the rule as a matter of course.

3. The learned Chancellor, when he refused to carry out the mandate of this Court, seems to have been influenced by an impression, that the judgment was not only erroneous, but also, that this Court possesses the power to correct its errors at a subsequent time. It is very certain that, after the Court has adjourned, its judgments, however erroneous, are incapable of revision, except for mere clerical defects and omissions. (Ex parte Sibbald, 12 Peters 492.) As the error, if one has been committed, is remediless, this consequence follows—when the direction contained in the mandate of the superior to the inferior Court is precise and unambiguous, it is the duty of the subordinate tribunal, to carry it into execution. And it ought not to decline obedience upon the supposition, that the superior Court has inadvertantly or otherwise committed an error.

The rule to show cause must be allowed on the facts disclosed by the petition.

We are perfectly satisfied, that the Chancellor, in refusing to carry into effect the mandate of this Court, has been consciencatiously impressed with the belief, that the Court had fallen into

an error; but a very slight examination must satisfy him that it is *not his* tribunal, which by law is invested with the revising power. And if this Court can, in the present case be directed by him to re-examine its decision, made after a most deliberate investigation, the same may occur in every other case.

Although it is entirely unnecessary to support a mandate which we have no power to recall, it is at all times most satisfactory to us, to be able to show what we consider to be sufficient reasons for the judgment, which we then considered and now believe to be correct.

The answers of all of the defendants, assert that letters of administration with the will annexed, were granted in April, 1834 ; that the estate was finally settled, and the assets paid over to the widow of the deceased, as his sole legatee, long before the commencement of the suit to set aside the will. It is very improbable therefore, that the rights of any creditors have been or could be impaired. In addition to this, if any special debts exist, binding on the heir, they may yet be sued, if they have assets by descent. If the administrators had in truth, as they aver, finally settled the estate with the Orphan's Court, and paid over the assets under the direction of that Court, to one then supposed to be entitled ; it is, to say the least of it, questionable, whether that Court could entertain any further jurisdiction over the subject matter.

The title of the widow of the deceased, to her property, obtained by fair course of settlement with the administrator, could not be impeached or divested by a Court of law, even, if any one of the complainants could make title, except through the administrator. These reasons seemed to us, and yet seem to be conclusive, that the equity of the case could alone be reached by declaring Glasscock and Wife, as trustees, with respect to the property of the decedent, for those entitled to distribution.

The Chancellor seems to be of opinion, that there is no prayer for general relief, and therefore, that relief should have extended no farther than to set aside the will, and leave the parties to get at their rights as they could. It has already been shown, that their rights could only be reached in equity, therefore they were to be informed, that they had not asked for enough ; what they had asked for would be given to them, and the remainder of

their rights would be accorded, whenever they filed another bill. But there is no magic in the words, *and for such other and further relief, as may seem agreeable to equity and good conscience.* The prayer of the bill, which is thought to be so constructed as to only authorise the specific relief previously asked for, is in these words, *and that the matters and things in the premises may be heard and determined, on the principles of equity.*

We have thus, with some labor endeavored to remove doubts, which we believe, have been most honestly entertained, but we hope, that hereafter it will not be supposed, that our decisions are inadvertently made.

We may remark further, that we have considered this case solely on the assertions of the petition ; if the action of the Court of Chancery was refused on the specific action required by the complainants, it may be questionable, whether the Court of Chancery was not correct in thus refusing. We do not give any opinion on this matter at present, but it will be seen, that the decree only extends to *distribution,* as in case of *intestacy.*